IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| GEORGE MONTES,<br><br>    PLAINTIFF<br><br>V.<br><br>REMINGTON ARMS COMPANY, INC.<br><br>    DEFENDANT | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CAUSE NO. 10-CV-0013 JAP-RHS<br>JURY TRIAL |

**PLAINTIFF'S MOTION FOR PRE-ADMISSION OF OTHER
SIMILAR INCIDENTS EVIDENCE, OR, ALTERNATIVELY, MOTION
REQUESTING EVIDENCIARY HEARING, AND BRIEF IN SUPPORT**

**I.      EXPLANATORY STATEMENT REGARDING PURPOSE OF MOTION**

Other incidents evidence is prevalent in product liability cases.  Plaintiffs often rely on this highly relevant evidence; Defendants routinely object to its admission on various grounds. The product in this case—Remington's Walker-based fire control—is or was the mechanism used in numerous Remington rifles and has been in use for over forty years.  Remington has received approximately 10,000 documented complaints of unintended discharge,[1] and in some years, Remington has received an average of more than one documented complaint per day.

Other trial courts have admitted Model 700 and Model 600 other similar incidents.  In filing this Motion, Plaintiff wishes to provide the Court with ample notice of this forthcoming evidentiary dispute to allow the Court at its discretion to either pre-admit this evidence based on briefing or hold a hearing regarding the evidence.[2]

---

[1] Plaintiff is in possession of over 20,000 pages of "Product Service Files" for customers claiming un-commanded discharge or that the firearm fired without the trigger being pulled:  PPS 0001-05967 (failures reported before December 1, 1993); PS 00001-15215 (failures reported after December 1, 1993.

[2] Plaintiff was also mindful of, and wanted to comply with, the Court's Scheduling Order, which requires that "Pre-trial non-discovery motions" be filed by March 7, 2011.

## OUTLINE OF MOTION

I.    **EXPLANATORY STATEMENT REGARDING PURPOSE OF MOTION**
II.   **SUMMARY OF MOTION**
III.  **FACTUAL BACKGROUND**
    A.   *The Incident—George Montes is Injured and Loses his Career as a Police Sniper*
    B.   *Extensive Claims and Litigation History of Remington's Defective Fire Control*
    C.   *The Defect*
    D.   *Remington's Forty-Year Knowledge of the Defect*
        1.   *Remington decides to recall the 600, but not the 700*
        2.   *Remington Contemplates Recalling the Model 700 for a Second Time*
IV.   **ARGUMENT AND AUTHORITIES**
    A.   *Substantially Similar Incidents are Generally Admissible*
    B.   *M700 Similar Incidents have been Admitted in Federal Court Remington Cases*
    C.   *Types of Other Similar Incident Evidence to be Offered*
        1.   *Customer Complaint Letters*
        2.   *Remington's Investigation of Complaints*
        3.   *Remington's Response to Customer Complaints*
        4.   *Summaries and Tabulations of Frequency of Complaints*
        5.   *Testimony from Customers*
    D.   *The Other Similar Incidents offered by Plaintiff are Substantially Similar*
V.    **REQUEST FOR RELIEF**

## II.   SUMMARY OF MOTION

Plaintiff and Defendant have appropriately conferred regarding this Motion.[3]

Plaintiff claims that a defective and unreasonably dangerous Remington Model 700 rifle discharged when Plaintiff opened the bolt absent a trigger pull.  Remington has received thousands of reports of similar unintended discharges for the Walker fire control, and Remington has even experienced hundreds of discharges absent a trigger pull in its own testing discharges in its own testing.[4]

Though Remington categorizes the specific manifestations of the defect in different ways, the same defect causes the product to catastrophically fail.  Whether the rifle fires on release of the safety, or fires when the bolt is open or closed (or when the rifle is otherwise jarred), the untimely release of the firing pin results from the un-commanded displacement of a spring-mounted but otherwise free-floating piece in the trigger mechanism called the connector.  Because movement of the connector by a distance of half of the thickness of a dime is all that is required to fire the rifle, even very small debris can displace the free-floating connector such that it will fire without a trigger pull.  The un-commanded displacement of the connector, whether by the sear itself if there is a "headspace" issue, or by environmental contaminants, is common to every claim of unintended discharge.

---

[3] Plaintiff forwarded this Motion to counsel for Remington on March 7, 2011 to discuss the relief requested.  On March 7, 2011, attorney Jeffrey W. Hightower, Jr. conferred with attorney Dale Wills.  Though the parties held a conference in good faith, no agreement could be reached.  Plaintiff has complied with his responsibilities under Federal Rule of Civil Procedure 37.

[4] Plaintiff's counsel sought sanctions for spoliation on behalf of other plaintiffs in federal court cases in Washington State and Georgia.  Both motions were denied, but the Washington Court noted:  "However, that does not mean that the evidence that rifles failed, and that they were discarded, is not relevant and admissible.  Remington will not be permitted to claim that they have never had an FSR, FBO or FBC incident, or that they documented or tested the offending units after they failed in the gallery."  *Hull v. Remington* (No. CV-10-05010 RBL) (UNITED STATES

The other un-commanded discharges experienced by users are "substantially similar" to the unintended discharge that occurred in this case. The fact that every unintended discharge occurs under slightly different circumstances goes the weight of the evidence and not its admissibility.

## IV.   FACTUAL BACKGROUND

### A.   *The Incident—George Montes is Injured and Loses his Career as a Police Sniper*

On March 22, 2009, at approximately 10:45 p.m., Plaintiff was attempting to unload a Model 700 rifle (Model 700 PSS; Serial # C6747095; Manufactured in 1993 Purchased in April 1993). When Officer Montes slapped the bolt open, and without pulling the trigger, the rifle fired, injuring Officer Montes' thumb and eye, and ending his career as a sniper.

### B.   *Extensive Claims and Litigation History of Remington's Defective Fire Control*

That the Walker fire control mechanism has been a liability problem would be a true understatement. Remington bolt-action rifles have a long history of firing without a trigger pull. As early as the 1940s, Remington was aware of the problem. To date, Remington has received approximately 10,000 customer complaints of unintended discharge. More than 135 lawsuits have been filed alleging the same defective design.

In addition, several juries, including at least one federal court jury,[5] have found Remington's fire control to be defective. For example, in 1994, a Texas jury found that the fire control was defective after Glenn Collins lost his foot to a Model 700 unintended discharge. See Exhibit A. The jury also found that Remington was grossly negligent and awarded $15,000,000

---

DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA), Order dated February 3, 2011, p. 5.

**PLAINTIFF'S MOTION FOR PRE-ADMISSION OF OTHER SIMILAR INCIDENTS EVIDENCE, OR, ALTERNATIVELY, MOTION REQUESTING EVIDENCIARY HEARING, AND BRIEF IN SUPPORT—Page 4**

in exemplary damages.  The total verdict, which was in excess of $17 million, sent a clear message to Remington—past and certainly future use of the defective fire control was unacceptable.

In the face of thousands of customer complaints, however, Remington refused to recall its rifles, install a new trigger, or warn its customers of the potential danger.  To make matters worse, when Remington designed the new Model 710 (introduced in 2001), it originally specified the non-use of the defective M700 fire control, but then returned to it to "eliminate development cost and time."

Not surprisingly, even though the Model 710 (now the Model 770) has only been on the market for ten years, Remington has already received hundreds of complaints from its customers of unintended discharge, mirroring the complaint history of the 700.

### C.      The Defect

The Remington trigger mechanism uses an internal component called the "connector"—a design component not used by any other rifle manufacturer.  The connector floats on top of the trigger inside of the gun, but is not physically bound to the trigger in any way other than tension from a spring.  (Illustration 1)  The connector cannot be seen or controlled by the gun handler. When the trigger is pulled, the connector is pushed forwarded by the trigger, allowing the sear to fall and fire the rifle.  (Illustration 2)

---

[5] *Lewy v. Remington* (discussed later).

**PLAINTIFF'S MOTION FOR PRE-ADMISSION OF OTHER SIMILAR INCIDENTS EVIDENCE, OR, ALTERNATIVELY, MOTION REQUESTING EVIDENCIARY HEARING, AND BRIEF IN SUPPORT—Page 5**



**Illustration 1**



**Illustration 2**

The proper position of the connector under the sear is an overlap of only 20/1000ths of an inch (approximately half the width of a dime or eight human hairs). The connector is not bound to the trigger other than by spring tension; during the recoil action after each firing of the rifle, the connector separates from the trigger several times and creates a noticeable gap between the two parts. Any dirt, debris or manufacturing scrap can become lodged between the connector and the trigger, causing the connector to not return to its original position. (Illustration 3)



**Illustration 3**

When enough displacement occurs, the connector will no longer support the sear (either no engagement is present, or insufficient engagement is present) and the rifle will fire without the trigger being pulled.[6] This can occur in a variety of ways such as when the rifle is jarred,

---

[6] Remington proved this in its own testing. In the mid-1990s, it systematically increased the engagement

dropped, when the safety is released, when the bolt is closed, or when the bolt is opened.  These unintended discharges occur so frequently that Remington actually created acronyms for its internal use (Fire on Bolt Closure—"FBC"; Fire on Bolt Opening—"FBO"; Fire on Safe Release—"FSR"; and Jar Off—"JO").  Irrespective of the various manifestations, all of the unintended discharges result from the same defective condition—the susceptibility of the connector to be displaced from its proper position.

When questioned about this susceptibility shown in Remington's own high-speed video footage, a Remington engineer, Michael Keeney, offered the following:

> Q.    In those frames, does the connector appear to be separated
>        from the trigger body?
>
> A.    Yes.
>
> Q.    And if debris is inside the housing, that would provide an
>        opportunity for debris to come between the connector and
>        the trigger body; correct?
>
>                         . . .
>
> A.    That is correct.
>
> (Keeney depo at pp. 197-198)

Derek Watkins, another Remington engineer, explained that this defect could lead to a dangerous situation:

> Q.    If the trigger doesn't return for whatever reason to full
>        engagement . . . , that is not safe; would you agree with
>        me?  Because the gun is now more susceptible --
>
> A.    It is more -- it is more sensitive, yes; it is more sensitive.

---

from 1/1000[th] and up past 10/1000[ths].  The rifle fired upon bolt closure without a trigger pull with the engagement set to 3/1000[ths] through 7/1000[ths].

> Q.     It is more sensitive to forces that would jar the rifle in such
>        a way for that engagement, basically, for the trigger no
>        longer to be underneath the sear and the gun to discharge?
>
> A.     Yes.

(Watkins depo at pp. 85-86)

James Ronkainen, another Remington engineer, also admits that failure of the connector

to properly engage leads to a dangerous condition:

> Q.     One common factor in a fire on safe-release and a
>        theoretical firing on bolt-closure is that the connector is not
>        in its appropriate condition – position; correct?
>
> A.     Yes.  It is unable to support the sear.

(Ronkainen depo at pp. 91-92)

This dangerous condition caused Remington to embark on redesign efforts several times

in the 1940s, 1980s, and 1990s.  The goal of those efforts was to eliminate the defect.

> Q.     The goal while you were there was to – is to achieve a
>        design that did not result in a fire on safety-release; is that
>        correct?
>                              . . .
>
> A.     The design was to eliminate any type of -- any type of
>        debris or any type of firing from that standpoint.  Fire on
>        bolt-closure, yeah, we did -- we definitely did not want that
>        to happen.

(Watkins depo at pp. 200-201)

Remington's defective fire control could have been redesigned to eliminate the harm or

danger very inexpensively.  Not only is Remington the only gun maker to employ the

"connector" in its fire controls, several companies have actually sold connectorless replacement

triggers for the Model 700 fire control for many years.  There is no valid engineering reason why

the successfully utilized connectorless designs could not have been used by Remington.  In January 2011, the 99-year-old designer of the Walker fire control (Mr. Walker) confirmed that the extra part served no engineering purpose other than to make operation of the trigger smoother for the user.

Remington finally redesigned the fire control in 2002 (before the incident in question). The new design, which eliminates the connector, is called the X-Mark Pro.  This safer[7] design would have prevented the injuries to Officer Montes had the Hobbs Police Department been retrofitted with the design under a recall.  Remington chose instead to ignore safety concerns over its old design and never warned the public.

### E.    Remington's Forty-Year Knowledge of the Defect

Because evidence of other similar incidents is probative of notice to Remington, as well as Remington's conscious indifference to the dangerousness of the defect, a chronology of the fire control's troubled history and Remington's refusal to address the problem is warranted.

In March 1968, just six years after the introduction of the Model 700, Consumer Reports wrote an article describing inadvertent discharges in the Model 700 rifle:

> The sixth-ranked rifle, the Remington 700, exhibited a potentially dangerous flaw as first tested.  There was so little clearance between the trigger and the trigger guard that when the trigger was pulled with the safety on (something you or a friend might do when sighting down the rifle or trying it for feel), the trigger sometimes failed to return to its forward position.  And with the trigger in the back position, <u>the rifle would fire without warning the next time the safety was</u>

---

[7] Even Remington's President and CEO, Thomas L. Millner, agreed in his 2007 deposition that the X-Mark Pro is a safer design (Question:  "Did [Remington] make a safer fire control with the X-Mark Pro?"  Answer:  "Yes, I believe so.").  Not only did Mr. Millner admit that the design is safer, he admits that the new design prevents the rifle from firing upon release of the safety (Question:  "And this new design precludes [fire on safety release] from occurring, true?"  Answer:  "True.").  Finally, he admits that the old design—the design placed into Officer Montes' rifle even after Remington had the new design—does not have safety features precluding fire on safety release (Question:  "And that's the fire control that does not have the safety features that preclude the fire on safe release, true?"  Answer:  "That's correct.").

moved to the fire position.  The malfunction persisted for more than 100 firings before the trigger wore in and performed normally.  An unwary buyer might have caused a serious accident by then.

A 1970 internal memo describes Remington Management's reaction to the article as one of "extreme displeasure."

### 1.    *Remington decides to recall the 600, but not the 700*

In 1978, Remington paid a $6.8 million settlement to John Coates, who was paralyzed from an unintended discharge.  After the settlement, Remington recalled all Model 600s (the rifle at issue in the *Coates* case).[8]

Remington sold far fewer Model 600 rifles than Model 700 rifles, facilitating its decision to only recall the 600.  Before the recall, during an internal evaluation of both models, Remington's Product Safety Subcommittee "discussed the issue of tricking, as well as other causes of accidental discharge."

Remington contemplated a recall of the Model 700, but concluded that recalling 2,000,000 guns, where its self-serving numbers indicated that only 20,000 are susceptible to problems, "would undercut the message we plan to communicate to the public concerning proper gun handling."

Instead, Remington decided that unintended discharge issues "are really problems more associated with abnormal use or misuse of the product rather than indication of a defective product.  Consequently, a notice warning or a series of warnings against abnormal use or misuse, and highlighting safe gun handling procedures, is the most direct solution to the problem of accidental discharge."

---

[8] The Model 600 is one of many Remington rifles that has employed a connector in its fire control.  However,

Here, we begin to see a pattern—Remington blames the user in order to preserve its defective yet profitable design.

Still, efforts to redesign the mechanism continued.  By January 1982, Remington was on its way to designing a new and safe fire control:

> Five Model 700 fire controls with blocked sears and blocked triggers are in the Test Lab for evaluation.  We are assembling sample fire controls employing a new trigger design <u>which does not require a connector</u> to eliminate a part, insure a more positive lift, and maintain proper clearance.

While engineers were making efforts to improve the design, more people were getting hurt.  In November of 1983, Mike Lewy pushed off the safety on his Remington Model 700 to unload a round in the chamber.  Immediately upon release of the safety, the rifle discharged, and the bullet struck his mother in the leg while she slept in a chair on the floor above.

By 1985, the new design, which was in the "final design stage," contained a safety that blocked both the trigger and the sear.  But on December 30, 1985, Remington placed its financial requirements ahead of safety concerns—"R & D is working on improved safety and security features which should have <u>marketable value</u>.  (If they don't, we ought to stop the work.)."  The redesign efforts were halted shortly thereafter.

Meanwhile, during that same year (1985), Remington paid $1.6 million to a New York man whose knees were shattered from a Model 700 unintended discharge.

In 1987, the inventor of the Model 700 fire control (Merle Walker) gave his deposition and admitted the dangerousness of the condition that existed:

---

Plaintiff does not offer 600 other similar incident evidence in this case.

**PLAINTIFF'S MOTION FOR PRE-ADMISSION OF OTHER SIMILAR INCIDENTS EVIDENCE, OR, ALTERNATIVELY, MOTION REQUESTING EVIDENCIARY HEARING, AND BRIEF IN SUPPORT—Page 12**

Q:      Would a situation that Remington, by its own estimates, states that about one percent of its Model 700's are susceptible, would that be an acceptable risk to Remington?

A:      No.

Q:      Do you think if that was the situation, Remington should look into redesigning these rifles?

A:      Yes.

Q:      And do you think if that were the situation, Remington should look into recalling those which are already on the market?

A:      Yes.

In 1988, Remington was ordered to pay $750,000 to an Alaskan man shot in the foot.

By 1993, documents reveal another telling reason that Remington resists a new and safe design.  In handwritten notes from October 15, 1993 ("Liability Point of View"), Remington is concerned about having a "readily defensible reason for departure from current design." Remington would make a safe fire control if only the act of doing so would not damn the earlier (and prevalent) design.  By its consistent failure to act, Remington had painted itself into a corner.

### 2.      *Remington Contemplates Recalling the Model 700 for a Second Time*

In 1994, after the $17 million *Collins* verdict, Remington's internal minutes for a Bolt Action Rifle Meeting pose a simple question:  "IS THE RIFLE SAFE?"

That summer, Remington contemplated a recall of the 700 so that the triggers could be replaced.  Remington accountants estimated that such a recall would cost Remington over $22 million, even if only 30% of the customers actually returned their rifles.  Remington elected against a recall.

In 1995, Remington again set out to redesign a <u>connectorless</u> fire control.  But before the redesign project began, internal Remington documents foreshadowed its end.  Remington's Fire Control Business Contract of January 27, 1995 provided:

> The goal is to provide a fire control that "feels" the same to our customers yet <u>provides additional safeguards against inadvertent or negligent discharges.</u>
>
> • • •
>
> The purpose of the redesign of the fire control is to reduce the number of parts required, <u>lower cost</u> and to add design characteristics that enhance the safety attributes of our firearms.

Under "<u>Financial Analysis</u>," we find this telling quote:

> This is where the rubber meets the road.  Is this project worth doing?  What are the minimum forecasts to <u>insure profitability</u> and does our pricing structure support these expected profits.

> The project to "enhance the safety attributes of our firearms" is only "worth doing" if

Remington can "insure profitability."  True to form, the M700 improvements program was ultimately cancelled for financial reasons.

Amazingly, Remington's former general counsel admits that the project to address "safety issues" was hinged on the new product costing "the same or less":

> It was my opinion that the new product was only worth doing if we could achieve certain goals, one of which was that it cost us the same or less, another was that we could make certain improvements on the product, which you asked me to characterize, and I said my opinion could be fairly characterized as ***safety issues***.

> *(Deposition of Robert Haskin, Page 237, lines 10-17) (emphasis added).*

### 3.    *Remington Designs a New Version of the 700—The Model 710*

By the late 1990's, Remington had repeatedly made a clear economic choice against recalling the Model 700.  But the Model 710 was to be a <u>new</u> rifle.

In 1997, against this sordid fifty-year historical backdrop, Remington faced an important but easily answered question regarding the new low cost bolt-action rifle it would market directly to beginners:  What fire control should Remington use?

Initially, Remington gave a clear and specific answer:  "Not the M700 fire control."

Embarking on a new design for the Model 710, Remington started where the cancelled M700 improvements program had ended—design a fire control without a connector.

The new design begins to meet its end during Remington's economic analysis.  From a February 1998 memo:

> Our impression of the designs is that they represent a great deal of potential. Some of the concepts deviate substantially from the processing capabilities at Ilion [New York], and therefore would require fairly substantial investments in capital and technical resources to implement.

Though Remington documents clearly show that the new design was favored, project spending was put on hold by management in May 1998 "until economics and project is approved."  That approval never came.

On August 25, 1998, the new safe design was abandoned due to an "estimated cost increase."  Instead, Remington decided to use the unsafe Model 700 fire control in the Model 710 to "eliminate development cost and time."  Remington now embraced the same fire control it had specifically rejected for the Model 710 just 18 months earlier.

On October 23, 2000, 9-year-old Gus Barber became another reason that Remington desired to move away from the Model 700 fire control.  Gus' mother was unloading the family's Model 700 with the barrel of her gun pointed at a horse trailer.  The rifle discharged when she released the safety, and the bullet went through the trailer's wall and hit her son in the abdomen

as he stood on the other side.  Nine-year-old Gus Barber's death resulted in national media attention.

Undeterred by the deaths, injuries, and thousands of customer complaints, Remington introduced the Model 710—with the same defective fire control—in 2000.  Remington compared the Model 710 to the Model 700 in its advertising, promoting the fact that both models utilize "the same crisp, single-stage trigger design."

Before introduction to the market, Remington conducted internal tests on the Model 710 rifle.  During testing, the Model 710 fired on at least one occasion upon bolt closure, and it fired on at least one occasion when the safety was moved from "safe" to "fire."  When asked if Remington was able to discern why its rifle had fired on bolt closure, Remington's own expert (Dan Walker) replied:  "Based on this information, they really don't nail down what the causes are."  (Walker depo pp. 110, ll. 9)

During that testing, Remington even warned its internal testers regarding inadvertent discharge:

> For each of the four rounds in the magazine the tester will close the bolt "smartly"—(i.e. as quickly as practical)—and be prepared for the rifle to inadvertently follow down or fire.

No such warning is found in the owner's manual for consumers.  Even more telling, the Remington Consumer Team Meeting minutes from December 13, 2001 showed that Remington actually planned for personal injuries as a result of unintended discharge with the new Model 710:

- Safety/Injury Calls and the Model 710 - Ken

> If a consumer calls with a safety concern, (ie FSR, fires when closed, personal injury or property damage, etc), these calls AND firearms go to Dennis or Fred

Remington <u>knew</u> that the same unintended discharges would begin occurring with the Model 710 just as they had with the Model 700, and put a system in place to handle the calls.  As predicted, Remington began receiving reports of injury and complaints of unintended discharge from the Model 710 soon after its introduction.

## V.    ARGUMENT AND AUTHORITIES

Other incident evidence is arguably the single most probative evidence on the question of whether the product that forms the basis of a claim is defective.  It assists in determining the existence and nature of a defect by identifying a suspect condition and quantifying the degree of danger associated with the real world use of product.  Other phrases used to describe this type of information are "product performance," "field-use," "safety history," and "real world environment of use."  After all, if one wants to know if a particular condition is dangerous, what better evidence than information that shows how the condition manifests itself during real world use?  It is common sense that the higher the number of incidents involving a product, the more likely it is that the product is the cause of the incidents and is dangerous or defective.

### A.    *Substantially Similar Incidents are Generally Admissible*

Federal courts applying New Mexico law have addressed these issues in product liability cases.[9]  These courts have held that other accidents are admissible to show notice, demonstrate the existence of a defect, or refute the testimony of a defense witness if they are substantially

---

[9]  *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246-50 (10th Cir. 2000); *Morales v. E.D. Etnyre & Co.*, 382 F. Supp. 2d 1252, 1265 (D.N.M. 2005).

similar.[10]  The precise degree of similarity depends on the theory of defect underlying the case.[11]

A high degree of similarity is required when plaintiff offers the other accidents to prove

causation in his case but a lesser degree of similarity is required when offered to show the

defendant had notice of potential defects in the product.[12]  To be admissible on the theory of

notice, the other accidents must only be similar enough to the event in question that they would

have alerted the defendant to the problem or danger at issue.  Subsequent accidents are not

admissible to show notice.[13]  Subsequent accidents may be admissible, however, to prove a

product is defective,[14] or to prove the defendant had the culpable mental state necessary to award

punitive damages.[15]

The requirement of substantial similarity does not require identical products.  It requires

substantial similarity among the variables relevant to the plaintiff's theory of defect.[16]  Similarity

of circumstances surrounding the other accidents is also dependent on the plaintiff's theory of

defect.[17]

### B.    M700 Similar Incidents have been Admitted in Federal Court Remington Cases

Due to the prevalence of unintended discharges with Remington rifles, other similar

incident evidence is always a key issue in Remington trials.  At least one federal court of appeals

has published an opinion specifically regarding the admission of other incidents in a case

involving the Model 700 rifle.  In *Lewy v. Remington*, 836 F.2d 1104 (8th Cir. 1988), the Eighth

---

[10] *See Smith*, 214 F.3d at 1246; *Morales*, 382 F. Supp. 2d at 1265.
[11] *Smith*, 214 F.3d at 1246.
[12] *See id*. at 1246-47.
[13] *See id*. at 1247-48.
[14] *See id*. at 1248.
[15] *See id*. at 1249.
[16] *See id*. at 1248.
[17] *See id*. at 1249.

Circuit held that other incidents of unintended discharge were relevant and properly admitted, and that section of the opinion is worth quoting extensively:

> The Lewys laid a foundation which established that the Model 700 evidence introduced was substantially similar to the Lewy Model 700. The Lewys established substantial similarity in both manufacture and defect primarily from records maintained by Remington. Remington prepared Gun Examination Reports (GERs) for every Model 700 which was returned to Remington because of customer complaints that the rifle fired on release of safety. Each report contains a statement of the customer's complaint and the circumstances relating to the alleged FSR. These GERs, as well as the other evidence supporting them, sufficiently established the foundation for the admission of the M700 evidence. In addition to the GERs, the Lewys introduced customer complaint letters, responsive correspondence prepared by Remington, and depositions and live testimony of some of the customers who complained to Remington.
>
> • • •
>
> Remington also argues that the evidence regarding other Model 700s is irrelevant. 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. As we have previously noted, a foundation was properly laid establishing that the Model 700 evidence was substantially similar to the Lewy Model 700. Therefore, the evidence was relevant to several contested issues in the trial. First, it was relevant to whether Remington had notice. Notice was a hotly contested issue and was an important element of the Lewy's failure to warn theory of the case. Additionally, notice is important in establishing a submissible case for punitive damages. Second, the evidence was relevant to show causation. Under Fed. R. Evid. 401, evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, * * * the standard of care, and causation.' *Kehm,* 724 F.2d at 625 (quoting *Ramos v. Liberty Mut. Ins. Co.,* 615 F.2d 334, 338-39 (5th Cir.1980), *cert. denied sub nom. Rucker Co. v. Shell Oil Co.,* 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981); *Thomas v. Chrysler Corp.,* 717 F.2d 1223, 1224-25 (8th Cir.1983).

It is also worth noting that the Eighth Circuit upheld a punitive damages submission to the jury, citing to evidence strongly suggesting that Remington knew that its design was dangerous.[18]

In *Williams vs. Remington* (3:05 cv 1383), tried to a jury in 2008, the Texas Northern District Court (Dallas Division) allowed evidence of customer complaints.  Exhibit C (first and last page of trial Exhibit 9).

### C.    Types of Other Similar Incident Evidence to be Offered

Other incidents evidence may be probative of several important issues such as:

- The existence and nature of the defect (including the relative dangerousness of the condition);

- Causation (including the impact of this issue on such other issues as contributory negligence, misuse, alteration, etc.);

- Notice (included in the status of the party's knowledge are such issues as foreseeability and the effect on the parties' duty to take certain action);

- Impeachment or rebuttal.

*See e.g. Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-339 (5th Cir. 1980).

In this case, other incidents evidence will be offered as evidence on all of these topics, and there are several different categories of evidence that will be submitted.

### 1.    Customer Complaint Letters

Remington has been notified of unintended discharges on approximately 10,000 occasions.  All of these complaints occurred under substantially similar circumstances (*i.e.* the

---

[18] Given the direct relevance of the *Lewy* opinion, and that the Eighth Circuit Court of Appeals affirmed evidentiary rulings similar, if not identical, to those that Plaintiff requests here, Plaintiff attaches the full opinion to this Motion. Exhibit B.

gun fired without a trigger pull when it was jarred "JO," when the bolt was closed or opened "FBC" or "FBO," or when the safety was released "FSR").  The following are selected quotes from customer complaints:

- "When I chambered the 13th round of the day, I closed the bolt and the round went off by itself for the first time.  I then fired three more rounds, and then the 17th round I chambered went off when I closed the bolt again for the second time."

- "As I was closing the bolt, at approximately ½ to ¾ closed, the rifle discharged, striking my father in his right arm, just below the elbow, causing extensive injuries."

- "I closed the bolt.  When I did the gun fired out a shell through my window.  My finger was nowhere near the trigger."

- "I opened the bolt to unload, and [the gun] went off."

- "When I put the bolt forward and locked it down into place, it immediately discharged.  …  My friend Fred Miller was there and witnessed what happened.  A few other hunters were at their trucks and it rattled everyone involved there."

- "I moved the bolt [and] the gun fired."

- "When bolt is closed the gun fires and jams."

- "Accidentally went off when bolt was closed."

- "As soon as I grabbed the bolt, the gun went off."

Four sample complaint letters received by Remington are appended as <u>Exhibit D</u> for the Court's reference.

These numerous unintended discharge complaints gave—and continue to give—Remington notice of the dangerous condition of its fire control.  Plaintiff intends to offer these customer complaint letters into evidence to show the extensive notice Remington has received.

### 2.      *Remington's Investigation of Complaints*

Upon receiving a complaint of unintended discharge, Remington documents the type and details of the complaint and conducts an "investigation" of the cause.  Four sample investigative files are appended as Exhibit E.

Plaintiff intends to introduce Remington's investigative files for each of the Model 700 and Model 710 complaints.  The files are business records of Remington, as well as party opponent admissions.  These files, in which Remington acknowledges and documents thousands of customer complaints of unintended discharge, are probative of defective design, causation, notice, conscious indifference, and impeachment of Remington's defense that the gun handler in this case must have pulled the trigger.

### 3.      *Remington's Response to Customer Complaints*

Once Remington completes its "investigation," it generally sends a form letter to the customer explaining its findings.  One sample response letter is appended as Exhibit F.

Plaintiff intends to introduce these Remington response letters to its customers.  The letters are business records of Remington, as well as party opponent admissions.  These letters, which acknowledge thousands of customer complaints of unintended discharge, are probative of defective design, causation, notice, conscious indifference, and impeachment of Remington's defense that the gun handler in this case must have pulled the trigger.

### 4.      *Summaries and Tabulations of Frequency of Complaints*

Several times during its history, Remington has engaged in the process of tabulating the number of complaints of unintended discharge it has received and then documenting them for its internal use.  Samples of these tabulations are appended as Exhibit G.

Plaintiff intends to introduce these Remington tabulations.  The tabulations are business records of Remington, as well as party opponent admissions.  The tabulations are probative of defective design, causation, notice, conscious indifference, and impeachment of Remington's defense that the gun handler in this case must have pulled the trigger.

### 5.   *Testimony from Customers*

Plaintiff intends to call witnesses, either live or through deposition testimony, to testify about unintended discharges.  All of the witnesses experienced an unintended discharge, then notified Remington.  This testimony is probative of defective design, causation, notice, conscious indifference, and impeachment of Remington's defense that the gun handler in this case must have pulled the trigger.

### D.   *The Other Similar Incidents offered by Plaintiff are Substantially Similar*

In this case, Remington will attempt to exclude some, if not all, of the other similar incident evidence by claiming that the unintended discharges occurred under different circumstances.  However, case law makes it clear that "similar" does not mean identical.  The differences that Remington will urge should go to the weight to be given the evidence, not its admissibility.

## V.   REQUEST FOR RELIEF

Plaintiff requests pre-admission of the offered other similar incidents evidence or a hearing during which the Court can consider this issue ahead of trial, and for any other just relief.

Respectfully submitted,

s/ Jeffrey W. Hightower, Jr.
Jeffrey W. Hightower, Jr.
HIGHTOWER ANGELLEY, LLP
4144 N. Central Expwy; Suite 1230
Dallas, Texas 75231
Phone:  214.580.9800
Fax:  214.580.9804
Email:  jeff@hightangel.com

Doug Perrin
The Perrin Law Firm
1322 Paseo de Peralta, Lower Level
Santa Fe, New Mexico 87501
Telephone  (505) 989-8800
Toll Free:   (866) 606-1201
Facsimile   (214) 646-6117

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF CONFERENCE</u>

Plaintiff forwarded this Motion to counsel for Remington on March 7, 2011 to discuss the relief requested.  On March 7, 2011, attorney Jeffrey W. Hightower, Jr. conferred with attorney Dale Wills.  Though the parties held a conference in good faith, no agreement could be reached. Plaintiff has complied with his responsibilities under Federal Rule of Civil Procedure 37.

s/ Jeffrey W. Hightower, Jr.
Jeffrey W. Hightower, Jr.

<u>CERTIFICATE OF SERVICE</u>

On March 7, 2011, I served this Motion through the Court's ECF filing system.

s/ Jeffrey W. Hightower, Jr.
Jeffrey W. Hightower, Jr.